# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09-cr-0332-07 |
| vs. | ) | |
| | ) | Judge Joan B. Gottschall |
| TONY SPARKMAN, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Tony Sparkman moves for a sentence reduction under what is sometimes called the compassionate release statute. The statute permits a court to reduce a defendant's sentence for "extraordinary and compelling reasons" after taking certain matters into account, including the factors considered at sentencing. 18 U.S.C. § 3852(c)(1)(A)(i) (West 2020). The government agrees that extraordinary and compelling reasons exist here but opposes a sentence reduction due to the nature of Sparkman's offense conduct. *See* ECF No. 1950 at 10–12.

Sparkman submits evidence that he is at serious risk of severe complications if he contracts the novel coronavirus. He is severely obese (almost 400 pounds) and has been diagnosed with high blood pressure, chronic sleep apnea, and a heart murmur. ECF No. 1909 at 3–7. Now 34 years old, Sparkman is serving a very long 40-year mandatory minimum sentence for serious crimes, including participating in at least two kidnappings. However, due to unrelated delays, one of Sparkman's co-defendants, Hector Uriarte, was the beneficiary of a sentence reduction under the First Step Act of 2018, reducing his sentence to half the length of Sparkman's, even though the government, this court, and a dissenting opinion of the Seventh Circuit agree that his conduct was far more culpable than Sparkman's. *See United States v. Uriarte*, 2020 WL 5525119, at *4 (7th Cir. Sept. 15, 2020) (en banc); *id.* at *10 (Barrett, J.,

dissenting).[1]   For the following reasons, the court grants Sparkman's motion for a sentence reduction.

## Background

Sparkman and his co-defendants participated in an expansive criminal operation masterminded by Saul Rodriguez along with former Chicago police officer Glenn Lewellen. Rodriguez and Lewellen began working together criminally in 1998 (Rodriguez had previously worked with Lewellen as a drug cooperator), and the enterprise grew to include at least 15 individuals before a Drug Enforcement Agency operation brought it to an end in 2009.   *See United States v. Cardena*, 842 F.3d 959, 971–72 (7th Cir. 2016).   The Rodriguez "crew" kidnapped and robbed drug dealers in order to extort payments of money and drugs.   *See id*.   At least three murders were committed, but Sparkman was not involved in any of the murders.   *See id*.; Third Superseding Indictment 10, ECF No. 274.

The multi-count third superseding indictment named a total of 11 defendants.   Third Superseding Indictment 1.   All defendants were charged with drug-trafficking offenses, and all but one were charged with a racketeering conspiracy.   *See id* at 2–39.   In Counts 8 and 11, Sparkman and co-defendants Hector and Jorge Uriarte were charged under 18 U.S.C. § 924(c) with using a firearm during and in relation to various kidnappings.   *Id*. at 30, 33.

Six defendants, including Sparkman, went to trial.   After a 12-week trial, a jury convicted Sparkman and all but one of his co-defendants on January 31, 2012.   The jury acquitted Sparkman of the cocaine trafficking charge alleged in Count Four and convicted him on Counts 1, 7, 8, and 10–13.   ECF No. 811.

---

[1] When these defendants were originally sentenced in 2012–13, Hector Uriarte received a sentence of 50 years.

**A. The First Step Act of 2018**

The passage of the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), frames some of the recent developments in this case. "The First Step Act is an historic, bipartisan attempt by Congress to take the lessons of the past and to formulate a new sentencing policy for the United States." *Uriarte*, 2020 WL 5525119, at *7.

In § 403 of the First Step Act, Congress amended portions of 18 U.S.C. § 924(c), which criminalizes possession of a firearm during or in furtherance of certain offenses. Counts 8 and 11 of the indictment charged three defendants, including Sparkman, with violating § 924(c) in connection with the charged kidnappings. The statute mandates a 5-year minimum sentence for a first offense and a 25-year minimum sentence for a second offense. Prior to the First Step Act, multiple § 924(c) offenses could be charged in the same indictment, as they were here, and the mandatory minimums for the two charges would be "stacked," resulting in a 30-year combined minimum for two counts. *Cardena*, 842 F.3d at 1000 (citing *Deal v. United States*, 508 U.S. 129, 134 (1993)) (Sparkman's first appeal); *see also United States v. Gonzales*, 520 U.S. 1, 9–10 (1997). Under the pre-First Step Act regime, the § 924(c) offenses in Counts 8 and 11 contributed 30 years toward the mandatory minimum sentences for Sparkman and the co-defendants charged in those counts. *Cardena*, 842 F.3d at 1000.

After the First Step Act, each § 924(c) offense charged in the same indictment carries a 5-year mandatory minimum (assuming the defendant has no final previous § 924(c) convictions). *Uriarte*, 2020 WL 5525119, at *1 (citing *United States v. Davis*, 139 S. Ct. 2319, 2324 n.1 (2019)). By its terms, Section 403 applies to offenses committed before the First Step Act was enacted "if a sentence for the offense has not been imposed as of such date of enactment." § 403(b), 134 Stat. at 5222, codified at 18 U.S.C. § 924 note.

**B. Sparkman's Initial Sentencing**

Sparkman's Pre-Sentence Investigation Report ("PSR"), as modified by the court,[2] calculated his total offense level as 41, Criminal History Category I (Sparkman had not been convicted of any crimes as an adult), giving him an advisory range of imprisonment of 324-405 months.[3] Sparkman Sent. Tr. 18, ECF No. 1219. Among other things, the court found Sparkman to be an average participant in the Rodriguez criminal enterprise, as contrasted with being a manager or organizer. PSR at 16, 17, 18, ECF No. 1107 ("[T]here is no evidence that the defendant occupied an aggravating role . . . .").

At his initial sentencing hearing (2013), Sparkman was sentenced to 42 years, the mandatory minimum required by the law at the time. The first three components of the sentence were: (i) 5 years for the first § 924(c) count; (ii) 25 years for the second § 924(c) count; and (iii) a 10-year mandatory minimum for the drug-trafficking counts. Sparkman Sent. Tr. 25-27. In addition, if a firearm is brandished during a § 924(c) offense the mandatory minimum increases from 5 to 7 years. 18 U.S.C. § 924(c)(1)(A)(ii). This court found that the government had proven brandishing by a preponderance of the evidence, applied the brandishing enhancement, and sentenced Sparkman to serve 42 years. The same mandatory minimum

---

[2] Sparkman's base offense level was tentatively calculated to be 40. Sent. Tr. 18. The subsequent statement of reasons and the amended statement of reasons issued after Sparkman's resentencing reflect the correct offense level of 41. Stmt. of Reasons 1; Am. Stmt. of Reasons 1. The original statement of reasons listed the incorrect range of punishment for offense level 41. The amended statement of reasons specifies the correct range of punishment: 324-405 months. To the extent prior documents reflect the incorrect offense level computation or advisory range of punishment, the court corrects them. *See* Stmt. of Reasons 1; ECF No. 1675; Fed. R. Crim. P. 36.

[3] The court directed the probation officer to prepare a corrected PSR after the original sentencing hearing. The corrected PSR is docketed as entry No. 1107, and a statement of correction containing the amended offense level computations is docketed at entry No. 1108. For simplicity, the court cites the corrected PSR and statement of correction, ECF Nos. 1107 and 1108, as "PSR."

applied to the two other defendants charged with § 924(c) violations, Hector and Jorge Uriarte. *Cardena*, 842 F.3d at 973.

As the Seventh Circuit noted in Sparkman's initial appeal, this court "expressed distress at the length of [Sparkman's] sentence." *Id*. at 1002. At Sparkman's sentencing hearing, the court stated, "I think the sentence provided by the mandatory minimums in this case is . . . in my view it's excessive." *Id*. (quoting Sparkman Sent. Tr. 17) (ellipsis in original)..

In this appeal, the Seventh Circuit vacated the two-year brandishing enhancements applied to Sparkman and the Uriartes under Count 8. *Id.* at 1000–02. Sparkman and his co-defendants challenged the brandishing enhancement under the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013), which was issued after they were sentenced. *Cardena*, 842 F.3d at 1000. The Supreme Court held in *Alleyne* that the jury, not the court, must find the brandishing element beyond a reasonable doubt. The Seventh Circuit reversed because the brandishing finding was made only at sentencing. *Id.* at 1000–02. The Seventh Circuit remanded for a plenary resentencing hearing. *Id*. at 1002; *Uriarte*, 2020 WL 5525119 at *2 n.2 (en banc) (explaining that "the remand in *Cardena* was for a plenary resentencing").

## C. Sparkman's Resentencing: October 2017

This court resentenced Sparkman in October 2017. Due to the *Alleyne* error, the mandatory minimum sentence fell from 42 to 40 years. *See* Re-Sent. Tr. 3–4, ECF No. 1693. This court sentenced Sparkman, as it was required to do, to serve 40 years. *Id*. at 6. Referring to the two § 924(c) counts, the court stated, "[I]f I had any choice, I would not stack them." *Id*. at 3. The court made this point more than once, adding, "I think, as I said in the first sentencing, that in the case of Mr. Sparkman -- certainly not in the case of everybody in this indictment, but in the case of Mr. Sparkman -- this sentence is way too long." *Id*. at 4.

Sparkman again appealed.   While his appeal of his resentencing was pending, Congress

passed the First Step Act.   Sparkman argued before the Seventh Circuit that he was entitled to

the benefit of § 403 of the First Step Act.   Citing its decision in *United States v. Pierson*, 925

F.3d 913 (7th Cir. 2019), the Seventh Circuit rejected Sparkman's argument and affirmed

Sparkman's 40-year sentence.   *Sparkman*, 973 F.3d at 774-75.

**D. Hector Uriarte's Resentencing: May 2019**

Hector Uriarte ("Uriarte") was Rodriguez's top lieutenant.   Due to his enhanced role in

the offense, this court initially sentenced him to serve a 50-year sentence, which was more than

the statutory mandatory minimum but less than the recommended guideline range of life.   The

Seventh Circuit vacated Uriarte's brandishing enhancement as well, but his resentencing took

considerably longer than Sparkman's.   The delay resulted in part from Uriarte's change of

counsel and from his filing of a *pro se* interlocutory appeal.   *United States v. Uriarte*, 2019 WL

1858516, at *1 (N.D. Ill. Apr. 25, 2019).   Uriarte's resentencing hearing was ultimately

scheduled for May 11, 2019.   By that time, the First Step Act had been enacted.

After receiving briefing on the question, this court held in April 2019 that § 403 of the

First Step Act applied to Uriarte.   *Id*.   As a result, Uriarte faced a mandatory minimum sentence

of 20 rather than 40 years.   This court resentenced Uriarte to serve the mandatory minimum

prison term.   The court identified several reasons for its decision, among them a decrease in

Uriarte's criminal history score due to the intervening invalidation of one of his prior

convictions, his excellent prison disciplinary record, Congress's elimination of stacking of

§ 924(c) sentences when it passed the First Step Act, developments after Uriarte's first

sentencing hearing shedding additional light on Saul Rodriguez's manipulation of the

government and his co-defendants, and the disparities between Uriarte's sentence and the sentences of his co-defendants.   *See* Re-Sent. Tr. at 15–26, ECF No. 1816.

The government appealed.   The *en banc* Seventh Circuit affirmed Uriarte's sentence on September 15, 2020.   *Uriarte*, 2020 WL 5525119.   The Court of Appeals analyzed § 403 of the First Step Act and determined that:

> Congress made crystal clear that § 403 reaches *all* defendants whose sentences had not been imposed before enactment—even those who had been convicted before the Act.   The text gives us no reason to believe that Congress excluded from this expansive reach certain defendants awaiting sentencing just because those defendants previously had received invalid sentences.

*Id*. at *6.

Then-Judge Barrett, joined by Judges Scudder and Brennan, dissented.   *Id*. at *7–10. Although the majority opinion does not specifically discuss the disparity between Sparkman and Uriarte's sentences, the majority states that "any reduction of criminal penalties will involve difficult line drawing with respect to pending cases."   *Id*. at *4 (citations omitted).   The dissenting opinion observes that Uriarte received a sentence 20 years shorter than Sparkman "despite, it should be noted, Uriarte's greater participation in the crime."   *Id*. at *10.

### E. Sparkman's Pending Motion for Sentence Reduction

On August 18, 2020, Sparkman filed a *pro se* motion for compassionate release, citing his health conditions and the outbreak of the novel coronavirus.   Mot. Compassionate Release, ECF No. 1902.   On August 28, 2020, the government filed its initial response in which it argued, among other things, that this court lacked jurisdiction to decide Sparkman's motion because his appeal was pending before the Seventh Circuit at the time.   Resp. Mot. Compassionate Release 7, ECF No. 1908.   In part because "Sparkman's motion provides this court with too little relevant information to allow it to determine whether or not it is inclined to

grant his motion," this court appointed the Federal Defender Program to represent Sparkman on September 2, 2020.   ECF No. 1915.   The Seventh Circuit decided Sparkman's appeal the next day, and counsel agreed to brief an amended motion for compassionate release.   *See* ECF Nos. 1929, 1931.   The motion has been fully briefed.

## Discussion

The compassionate release statute permits the court to reduce a sentence for "extraordinary and compelling reasons."   18 U.S.C. Section 3582(c)(1)(A)(i).   The statute also contains an exhaustion requirement.   An imprisoned person may file a motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."   18 U.S.C. § 3582(c)(1)(A) (West 2020).

The government concedes that Sparkman has complied with § 3582(c)(1)(A)'s exhaustion requirement.   Am. Resp. Mot. Compassionate Release 8, ECF No. 1950.   Sparkman submitted an administrative request for compassionate release to the warden of his facility on June 3, 2020.   ECF No. 1946 Ex. F at 1.   His request was denied more than 30 days ago, on July 28, 2020.   *Id*.   Because exhaustion is not disputed and more than 30 days have passed since the submission and denial of Sparkman's request, the court proceeds to the merits of Sparkman's motion.

## A. Standard for Sentence Reductions

There is no dispute here about whether at least some required "extraordinary and compelling reasons" exist.   Sparkman identifies a confluence of factors that he argues together constitute extraordinary and compelling reasons for a sentence reduction.   First and foremost,

Sparkman asserts that his race and his diagnosed medical conditions (discussed in detail below) put him at risk for severe complications if he contracts COVID-19 because the conditions in prisons and jails are ideal for the disease's spread.   Am. Mot. Compassionate Release 9–13, 16-22, ECF No. 1946.   Second, Sparkman submits that this court can consider the unfairness of the stacking of his § 924(c) convictions, as recognized by Congress when it passed the First Step Act.   *Id*. at 22–27.   Sparkman also points to evidence of his rehabilitation, including his post-arrest conduct and the record he has accumulated in prison.

Before the enactment of the First Step Act and the outbreak of the COVID-19 global pandemic, the United States Sentencing Commission promulgated a policy statement providing a non-exhaustive list of extraordinary and compelling reasons justifying a § 3582(c)(1)(A)(i) sentence reduction and specific criteria for each.   *See* U.S.S.G. § 1B1.13.   The specific circumstances broadly cover compassionate release based on the defendant's medical condition, age, and family circumstances.   *See id*. cmt. n.1(A)–(C).   The list also includes a catch-all provision: "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."   *Id.* cmt. n.1(D).

The government concedes that Sparkman satisfies one of these criteria.   "The government . . . agrees that, in light of the pandemic, Sparkman has established that he suffers from 'a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.'"   Am. Resp. Mot. Compassionate Release 10 (quoting U.S.S.G. § 1B1.13 cmt. n.1(A)(i)).   The government nevertheless argues that under the statutory sentencing factors this court must consider, 18 U.S.C. § 3553(a), Sparkman's sentence should

not be reduced. The government relies on the seriousness of Sparkman's offense conduct, the need to provide for adequate punishment, considerations of specific and general deterrence, and an inference, made again from Sparkman's offense conduct, that he remains a danger to the community if released. *See id*. 10–12.

The government does not discuss the other extraordinary and compelling reasons Sparkman identifies, in particular the effect of § 403 of the First Step Act on the stacking of his firearm convictions. *See id*. The Seventh Circuit has not yet provided guidance in a published opinion on what constitute extraordinary and compelling reasons for a sentence reduction under § 3582(c)(1)(A)(i) after the First Step Act. The United States Court of Appeals for the Second Circuit recently issued the first published appellate opinion on this subject. *United States v. Brooker*, No. 19-3218-CR, 2020 WL 5739712 (2d Cir. Sept. 25, 2020). Adopting the holding of a "majority" of district courts, *id*. at *5, the Second Circuit held that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of guideline § 1B1.13, limits the district court's discretion." *Id*. at *7. This court adopted this view of § 3582(c)(1)(A)(i) (which is the majority view in this district) in *United States v. Cardena*, No. 09-cr-0332-11, slip op. at 6 (N.D. Ill. May 15, 2020) (motion of Robert Cardena), and this court views the Second Circuit's decision in *Brooker* as persuasive. The *Brooker* court elaborated as follows:

> [C]ompassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place. *Id*. Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad. The only statutory limit on what a court may consider to be

> extraordinary and compelling is that "[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

*Id*. at *8 (some internal citations and emphasis omitted).

Thus, a court faced with a § 3582(c)(1)(A)(i) motion may consider, for example, a defendant's age when the offense was committed, the court's statements at the sentencing hearing about "the injustice of [the defendant's] lengthy sentence," and the interaction of these factors with the current coronavirus pandemic. *Id*. at *8–9 (citations omitted). Consistent with *Brooker*'s reasoning, at least one district court in the Seventh Circuit has held that "it is not precluded" from considering "the effect of a radically changed sentence [under § 924(c)] for purposes of applying § 3582(c)(1)(A)(i)."[4] *United States v. Clark*, 2020 WL 4260824, at *3 (E.D. Wis. July 23, 2020) (quoting *United States v. O'Bryan*, 2020 WL 869475, at *1 (D. Kan. Feb. 21, 2020)); *see also id*. at *2 (collecting additional decisions reaching the same conclusion); *cf. United States v. Turner*, 2020 WL 5717096, at *4–5 (E.D. Wis. Sept. 24, 2020). The government offers no reason to reject the reasoning of *Brooker*.

But whether the Seventh Circuit were to agree or disagree with the reasoning of *Brooker* and the majority view among district courts, as it recently explained in the context of a different First Step Act provision permitting resentencing, "nothing in the First Step Act precludes a court from looking at [the] § 3553(a) factors anew." *United States v. Shaw*, 957 F.3d 734, 741 (7th

---

[4] This case does not present the question of whether the First Step Act's elimination of stacking § 924(c) sentences is by itself an extraordinary and compelling reason for a sentence reduction under § 3582(c)(1)(A)(i). Several district courts have answered that question in the negative. *See United States v. Fulcher*, 2020 WL 4547970, at *1-2 (S.D. Ind. Aug. 5, 2020) (alternative holding; § 403 is not "on its own" an extraordinary and compelling reason for a sentence reduction); *United States v. Rollins*, 2020 WL 3077593, at *1–2 (N.D. Ill. June 10, 2020) (holding that § 3582(c)(1)(A)(i) does not authorize a sentence reduction solely based on the change made by § 403 of the First Step Act); *United States v. Garcia*, 457 F.Supp.3d 651, 656 (C.D. Ill. 2020) (same); *United States v. Neubert*, 2020 WL 4604449, at *1 (S.D. Ind. Aug. 11, 2020) (same). *Clark*, the case cited in the text, conflicts with those decisions, for the defendant did "not fall into any of the other categories for compassionate release." *Clark*, 2020 WL 4260824, at *4 (denying motion). This court expresses no opinion on this question.

Cir. 2020) (citation omitted); *see also United States v. Sutton*, 962 F.3d 979, 986 (7th Cir. 2020). The resentencing court may consider changes in the statutory mandatory minimum and maximum sentence as well as intervening changes to guidelines; these updates "may reflect updated views about the seriousness of a defendant's offense or criminal history." *Shaw*, 957 F.3d at 742 (citing *United States v. Smith*, 954 F.3d 446, 451 (1st Cir. 2020)). The defendant also "may, . . . present evidence of his post-sentencing conduct in support of a reduced sentence. And a court may look to § 3553(a)'s familiar framework when assessing whether to impose a reduced sentence." *Id.* Thus, to the extent *Shaw* applies in this case, this court may consider the changes Congress has made to the stacking of § 924(c) offenses and Sparkman's post-sentencing conduct as part of its § 3553(a) analysis. Indeed, this court did exactly that on the compassionate release motion of a codefendant, Glenn Lewellen, ruling that, owing to the need to avoid unwarranted disparities, the reduction of Hector Uriarte's sentence placed "downward pressure" on Lewellen's sentence. *United States v. Lewellen*, No. 09-cr-0332-2, 2020 WL 2615762, at *6 (N.D. Ill. May 22, 2020). As discussed fully below, the 20-year reduction of Uriarte's sentence and the disparities it creates have a similar effect on the § 3553(a) analysis of Sparkman's motion.

## B. Application

As with Sparkman's co-defendant Glenn Lewellen, Sparkman's motion presents a difficult set of questions. Sparkman bases his motion first and foremost on his risk of complications if he contracts the novel coronavirus.

By their nature, the way in which prisons and jails operate facilitates the rapid spread of diseases like the novel coronavirus. *E.g.*, *Mays v. Dart*, 456 F.Supp.3d 966, at 976–77 (N.D. Ill. Apr. 27, 2020), *aff'd in part, vacated in part, rev'd in part on other grounds*, 2020 WL 5361651

(7th Cir. Sept. 8, 2020).   The government argues that the BOP has implemented a plan intended

to minimize the spread of the novel coronavirus through its facilities.   However, despite the

BOP's containment efforts, reported COVID-19 cases at the federal correctional institution in

Pekin, Illinois ("FCI-Pekin"), where Sparkman is housed, have skyrocketed in the last three

weeks.   As of October 2, 2020, the BOP website reported that 10 inmates tested positive for the

novel coronavirus at FCI-Pekin, and 9 staff members had recovered.   Am. Mot. Compassionate

Release 16, ECF No. 1946.   Seven days later, the numbers increased only modestly to 11

inmates and one staff member.   Am. Resp. to Mot. Compassionate Release 5, ECF No. 1950.

But ten days later, on October 22, 2020, the BOP reported 80 total cases (74 inmates and 6 staff

members) testing positive at FCI-Pekin.[5]   This eight-fold growth over 20 days (from 10 cases on

Oct. 2 to 80 cases on Oct. 22) indicates that an outbreak is underway at FCI-Pekin.

Accordingly, if he is not released or transferred, Sparkman has a high likelihood of contracting

the novel coronavirus.

What, then, is the risk to Sparkman personally if he contracts COVID-19?   His

diagnoses are not disputed.   In 2012, Sparkman had been diagnosed with high blood pressure

(hypertension), a herniated disc in his back, sleep apnea, and a heart murmur.   PSR 25, ECF

No. 1107.   His prison medical records show that he has continued to receive treatment for high

blood pressure.   *See* Medical Records 1, ECF No. 1909.   Sparkman also uses a CPAP machine

to treat his chronic sleep apnea.   *Id*. at 1, 7.   Sparkman does not discuss his heart murmur

diagnosis.

Sparkman is also severely obese.   His PSR did not mention obesity as a diagnosis, but

Sparkman stood 6'4" tall and weighed 290 pounds in 2012.   PSR 24.   Sparkman's BOP

---

[5]  BOP: COVID-19 Update, https://www.bop.gov/coronavirus/index.jsp [last visited Oct. 22, 2020].

medical records show that he weighed 392 pounds in February 2020.   Medical Records 6.

Sparkman calculates his body-mass index to be 40, meeting the Centers for Disease Control and

Prevention ("CDC") definition of severe obesity.   *See* Am. Mot. Compassionate Release 8.

The government argues that Sparkman's medical conditions can be managed by BOP

medical staff.   Am. Resp. to Mot. Compassionate Release 10–11.   That may well be true, but it

fails to address Sparkman's coronavirus risk.   The CDC website on risk factors for COVID-19

advises people with underlying medical conditions to "continue following your treatment plan."

Still, "[h]aving . . . hypertension (high blood pressure) [as Sparkman does] . . . may increase your

risk of severe [COVID-19-related] illness," and "[h]aving obesity, defined as a body mass index

(BMI) between 30 kg/m2 and <40 kg/m2 or severe obesity (BMI of 40 kg/m2 or above),

increases your risk of severe illness from COVID-19."   The government does not dispute that

Sparkman meets the definition of severe obesity.   Moreover, "[t]he more underlying medical

conditions someone has, the greater their risk is for severe illness from COVID-19."[6]   Hence

Sparkman's chronic sleep apnea, herniated disc, and possible heart murmur further increase his

risk of severe COVID-19 complications.   Considering Sparkman's severe obesity, hypertension,

and all of his medical conditions, his risk of severe COVID-19 illness is significant.

With respect to the § 3553(a) factors, the government focuses on Sparkman's offense

conduct to argue that reducing his sentence would deprecate the seriousness of his crimes and

thwart the goals of deterrence and promoting respect for the law.   Am. Resp. to Mot.

Compassionate Release 10–12.   Sparkman has approximately 26 years left to serve of his

expected sentence, with credit for good time.   *Id*. at 5.   The government submits that the court

---

[6] The quotations in this paragraph come from CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html [last updated Oct. 16, 2020; visited Oct. 28, 2020].

correctly balanced the § 3553(a) factors when it sentenced Sparkman to serve 42 years in 2012. *See id.*

But as this court made plain in 2012, the long mandatory minimums caused by the stacking of § 924(c) offenses dictated Sparkman's sentence. *See* Sparkman Sent. Tr. at 26–27, ECF No. 1219. As the court stated, "I think the sentence required by the mandatory minimum in this case is far greater than necessary to accomplish the purposes of [§] 3553, including the purpose of making clear the seriousness of the offense." *Id.*; *accord id.* at 17; Sparkman Re-Sent. Tr. 3–4, ECF No. 1693; Am. Stmt. Reasons 2, ECF No. 1677 (handwritten annotation). The court elaborated, "I think that Mr. Sparkman, however bad and however violent the crimes that he committed here, I think he has the potential and he has the background that indicates that he could live a productive and law-abiding life, and this sentence is going to make it hard for him to do that in the short-term. I think that's kind of sad." Sent. Tr. at 27. Indeed, the 40 year mandatory minimums here exceed by 13 years the low end of what the advisory sentencing guidelines recommend as a range of punishment (324–405 months). *See* Am. Stmt. Reasons 2; Stmt. of Corrections 7, ECF No. 1108. To say, as the government does repeatedly, that the court balanced anything at Sparkman's initial sentencing is to indulge in a fiction. The court gave Sparkman the minimum sentence allowed by the government's charging decision, and it did so persuaded of its profound excessiveness.

Sparkman committed serious crimes. They involved the intimidation and kidnapping of some innocent people and the use of "horrifying violence." *Id.* at 25 (statement of the court). As a member of Rodriguez's crew, Sparkman participated in at least two kidnappings of people in the drug trade: sometimes with threats, sometimes with guns—all in order to locate and steal drugs or money. *See* PSR at 13; *Cardena*, 842 F.3d at 971–72. Nonetheless, it is important to

15

note that Sparkman joined Rodriguez's crew only in 2006. At that time, the enterprise had been

operating for a decade, and Hector Uriarte, a senior manager who had participated in planning an

attempted murder in 2005, had already been involved for five years.   *See* Am. Resp. to Mot.

Compassionate Release 2; *Cardena*, 842 F.3d at 972; H. Uriarte PSR at 16.   Sparkman's crimes

deserve serious punishment, but the punishment cannot be "greater than necessary" to

accomplish the Congressionally mandated objectives of sentencing.   18 U.S.C. § 3553(a).

The government does not discuss several of those objectives, most notably the disparities

between Sparkman's sentence and the sentences of his co-defendants.   One of the § 3553(a)

factors the court must consider is "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct."   § 3553(a)(6);

*Lewellen*, 2020 WL 2615762, at *6.   As discussed in detail above, once the court's hands were

untied by the First Step Act's elimination of the stacking of the § 924(c) offenses in Counts 8 and

11, co-defendant Hector Uriarte received a sentence 20 years shorter than Sparkman's under the

§ 3553(a) factors.   The disparity between Uriarte and Sparkman's sentences has nothing to do

with their roles in the Rodriguez crew's operations, or any other proper consideration under

§ 3553(a).   On the contrary, as the dissent in Uriarte's appeal put the matter, Sparkman received

a sentence 20 years longer than Uriarte's "despite Uriarte's greater participation in the crime."

*Uriarte*, 2020 WL 5525119, at *10 (Barrett, J., dissenting).   This court has repeatedly remarked

on the unfairness of this result.   Sparkman Sent. Tr. 22; Sparkman Re-Sent. Tr. 3–4, ECF

No. 1693.   As the government stated at Uriarte's resentencing hearing, "Hector Uriarte was

involved in almost every single violent act that was part of this case."   H. Uriarte Re-Sent.

Tr. 29, ECF No. 1844; *accord id*. at 30 (arguing that "Tony Sparkman was far less involved in

many of the violent incidents that were part of this case"); *id*. at 37 (court describing Uriarte as "the worst of the worst"); *accord* H. Uriarte Sent. Tr. 13, ECF No. 1388.

The disparity between Uriarte and Sparkman's sentences results from the timing of their two resentencing hearings and the application language set out by Congress in the First Step Act. *See Uriarte*, 2020 WL 5525119, at *4 (en banc maj. op.); *United States v. Sparkman*, 973 F.3d 771, 774-75 (7th Cir. 2020). The disparity between these sentences cannot be justified under § 3553(a). It does not promote respect for the law, § 3553(a)(2)(B), for a less culpable person to receive double the sentence of a more culpable person. [7]

Indeed, Sparkman received the same sentence as Saul Rodriguez, the criminal mastermind behind all the misery and brutality described at trial. Sparkman has been sentenced as though he too was a criminal mastermind, rather than an average participant (Am. Resp. to Mot. Compassionate Release 2). Sparkman Sent. Tr. 22 (statement of the court: "Mr. Sparkman was nowhere near the center of this conspiracy.").

The court has benefited from evidence it heard at the co-defendants' sentencing hearings after it first sentenced Sparkman. *See Shaw*, 957 F.3d at 742. The court described one such development at Uriarte's resentencing hearing:

> In reflecting also on this case, it seems to me that the impact of Saul Rodriguez on Hector Uriarte and on the other defendants was not adequately appreciated by most of us at the time of the original sentencing. In white collar cases, the ability of a con artist to induce people to do things they otherwise might not have done is well-known and well-appreciated.
>
> Mr. Rodriguez is probably the most effective con man I have ever seen in my capacity as a judge. He conned the government, telling all kinds of lies to the grand jury, as I understand it; getting a telephone smuggled into him in the MCC, so he could communicate with potential witnesses, including arranging hits on

---

[7] Another of Sparkman's co-defendants, Glenn Lewellen, is a former Chicago police officer who played an aggravating role in the Rodriguez crew. He went to trial and received an 18-year sentence. That sentence accords with Uriarte's 20-year sentence since both stood near the top of the Rodriguez crew's hierarchy. *See Lewellen*, 2020 WL 2615762, at *6.

potential witnesses. This is when he is in the MCC cooperating with the government.

If Mr. Rodriguez could so effectively con the government, is it any surprise that he conned his co-defendants, including Hector Uriarte? He certainly conned the families of his victims, kidnapping people and, then, convincing their families that he could help them pay the ransom, which they would, then, have to help -- then they would have to pay him back for [his help].

H. Uriarte Re-Sent. Tr. 43, ECF No. 1844. Rodriguez created this conspiracy and was behind all of its horrendous activities. His criminal responsibility (which included obstructing justice) continued even when he was incarcerated and purportedly cooperating. Rodriguez and Sparkman should not receive the same sentence.

The court next considers the need to protect the community and Sparkman's dangerousness. Sparkman grew up on Chicago's south side in what he described as a "gang neighborhood." PSR 24. He was raised by his single mother, his grandmother, his aunts, and their friends. *See id*. at 23; ECF No. 1053-1 at 4. He had no contact with his father. *See* PSR 24; ECF No. 1053-1 at 4. Sparkman began playing football in grade school. ECF No. 1053-1 at 3, 4. He also showed academic promise. His mother reported that he earned all A's in elementary school. *Id.* at 4; PSR at 24. Sparkman joined a neighborhood gang at age 14. PSR 24. At age 15, Sparkman's mother's health declined, and he moved to Minnesota to live with his aunt. ECF No. 1053-1 at 8. Now far from his gang neighborhood, Sparkman excelled in high school football and also academically. He maintained a grade point average above 3.0 and scored a 26 on the ACT test. *Id*. (letter from Sparkman's aunt); *see also id*. at 5. That ACT score placed Sparkman in the top 14% of all test takers nationally.[8] As a result of his academic and athletic achievements, colleges around the country offered Sparkman football

---

[8] ACT Research Services, High School Profile Report HS Graduating Class 2004, at 10 (2004), http://www.act.org/content/dam/act/unsecured/documents/Natl-Scores-2004-data.pdf

scholarships. ECF No. 1053-1 at 5. He decided to attend the University of Illinois in order to be close to his family. *Id.*

But shortly after Sparkman arrived at the University of Illinois, an injury brought his dreams of playing professional football to an abrupt end. *See* PSR at 24; ECF No. 1053-1 at 8. Sparkman did not give up easily. While still in recovery from his injury, he transferred to North Dakota State University to play football, but his shoulder was soon reinjured in a car accident. PSR 24. Sparkman then returned to Chicago in an attempt to recover from his injuries, in the hope of one day playing arena football. *Id.* Once back in Chicago, he fell in with his old street gang. *Id.*

Rodriguez and his crew recruited Sparkman at this low point in his life, when he was just 20 years old. At this point, Sparkman had no adult criminal history. As this court stated at Sparkman's first sentencing hearing, had Sparkman been "left alone," he probably would not have committed these crimes. He became involved due to the "wiles of the main actors in this conspiracy." Sparkman Sent. Tr. 22–23., ECF No. 1219.

At sentencing in 2012, this court opined that Sparkman showed every sign that he could "live a productive life." *Id*. at 27. As already mentioned, quite apart from football, Sparkman showed considerable academic promise before and during high school—particularly once he moved away from the south side of Chicago to Minnesota. *See* ECF No. 1053-1 at 5, 8. He pursued his goals with tenacity, transferring to a school in North Dakota rather than giving up on his dreams.

Before his sentencing hearing, Sparkman submitted a dozen character letters from friends, an employer, and extended family members. They uniformly describe Sparkman as a generous person who was the "rock" of the family and took responsibility for caring for others,

including children.  *E.g.*, ECF No. 1053-1 at 1, 2, 4, 5, 9.  When these letters were written, three years had passed since Sparkman's arrest.

To cite a specific example, when his mother became ill, Sparkman stepped in to care for his 13-year-old brother and two other children for whom his mother was responsible.  *Id*. at 3.  Sparkman also did yard work for his mother and learned to garden.  *Id*.  Sparkman's long-term romantic partner at the time (the relationship's present status is unknown) wrote a letter describing the role Sparkman played in her then five-year-old son's life.  *Id*. at 3.  It did not matter that Sparkman had no biological connection.  *Id*.  Sparkman "raised, protected, and loved" the boy from the age of two months, according to the letter.  *Id*.  The five-year-old had "come to know [Sparkman] as his only father."  *Id*.

Sparkman's post-arrest employment further indicated that he could live a productive life. When he was arrested in 2009, Sparkman had never had steady work as an adult.  *See* PSR 30. After Sparkman was released on bond, he found a job loading trucks and worked steadily for over a year.  *Id*. at 26–27.  A manager with whom Sparkman worked described him as "on time and a self-starter."  ECF No. 1053-1 at 6.  He added that Sparkman was "a hard worker, dependable, and doesn't mind staying overtime to finish the job.  If there is extra work to be done, [Sparkman] has no problem with helping."  *Id*.

The BOP classifies Sparkman as a "medium" security risk.  ECF No. 1946 Ex. A at 1. He has received four disciplinary writeups in prison, all minor; the most recent occurred in March 2019.  *See id*. at 2 (destruction of property worth less than $100).  Nevertheless, he has been entrusted with a prison job as an orderly, which suggests that BOP officials do not view his disciplinary history as a major concern.  *See id.*  Furthermore, Sparkman has completed numerous courses while in prison on a variety of vocational and personal growth subjects,

including parenting, keyboarding (typing), financial literacy, and searching for a job.   *See id.*
Ex. B (collecting certificates of completion).   This evidence paints a picture of a person who has
experienced substantial growth since his recruitment in this criminal enterprise at age 20.
Sparkman has also submitted letters from friends and family members attesting to the support he
has provided them from afar while in prison.   *See id.* Ex. D at 3–6, 8–9.   Indeed, given
Sparkman's history and his conduct since his arrest, it is likely that he no longer presents any
danger to the community.

Finally, Sparkman has a solid release plan and a supportive network of family and friends
to aid his transition.   He plans to live with his mother in their two-story home in Chicago.   *See
id.* at 1.   One of his older sisters has offered to help him find work that will allow him also to
care for her children.   *Id.* at 3.   His other sister pledges financial and personal support as well as
help with transportation, as does his aunt.   *See id.* at 5, 6.   The probation office for this district
recently inspected his mother's home and approved Sparkman's release plan.   Letter from
K. Ruiz, *id.* Ex. E (inspection conducted July 7, 2020).   Sparkman's support network and this
approval mitigates concerns that Sparkman will not receive the BOP services normally provided
to assist prisoners with reentry.

## Conclusion

The court has weighed the nature and seriousness of Sparkman's crimes, the need to
promote deterrence and respect for the law, and the need to avoid unjustified sentencing
disparities, along with the other § 3553(a) factors.   He faces a serious and immediate risk both
of contracting COVID-19 and of developing serious complications if he does.   In the final
analysis, a sentence of the time Sparkman has served is sufficient but not greater than necessary
to accomplish Congress's sentencing objectives.   Accordingly, and for the reasons stated,

21

Sparkman's motion under 18 U.S.C. § 3582(c)(1)(A)(i) for a sentence reduction is granted.   An

amended judgment will be issued separately.


Dated:   November 18, 2020                         _____/s/_____
                                                   Joan B. Gottschall
                                                   United States District Judge